# 25-81

## United States Court of Appeals
## for the Second Circuit

DOORDASH, INC.,

*Plaintiff-Appellee,*

GRUBHUB INC. and PORTIER, LLC,

*Consolidated-Plaintiffs-Appellees,*

*against*

CITY OF NEW YORK,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR APPELLANT**

RICHARD DEARING
CLAUDE S. PLATTON
JONATHAN SCHOEPP-WONG
   *of Counsel*

May 23, 2025

MURIEL GOODE-TRUFANT
*Corporation Counsel*
*of the City of New York*
Attorney for Appellant
100 Church Street
New York, New York 10007
212-356-2275
jschoepp@law.nyc.gov

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................iii

PRELIMINARY STATEMENT...........................................................1

JURISDICTIONAL STATEMENT .....................................................4

ISSUE PRESENTED...........................................................................4

STATEMENT OF THE CASE.............................................................4

A. The changing economic landscape for restaurants and the rise of third-party delivery upending traditional business models.....................................................................4

B. The New York City Council's inquiry into the impact of third-party delivery on restaurants and consideration of the Customer Data Law .....................................................9

C. The City Council's enactment of the Customer Data Law14

D. Plaintiffs' commencement of this litigation and their practices concerning customer data ...............................17

E. The parties' cross-motions for summary judgment and the district court's erroneous First Amendment determination................................................................20

STANDARD OF REVIEW AND SUMMARY OF ARGUMENT .....23

ARGUMENT

THE CUSTOMER DATA LAW DOES NOT VIOLATE THE FIRST AMENDMENT.........................................................27

A. The Customer Data Law regulates only commercial speech, which receives only limited First Amendment protection. ...................................................................28

i

## TABLE OF CONTENTS (cont'd)

**Page**

B.  Because it requires the disclosure of only accurate, factual commercial information, the Customer Data Law is subject only to rational basis scrutiny...........................37

C.  The Customer Data Law is reasonably related to the City's legitimate interests and satisfies *Zauderer* rational basis scrutiny. ................................................46

D.  Even if intermediate scrutiny applied, the Customer Data Law would satisfy that standard. ...........................53

CONCLUSION ................................................................61

CERTIFICATE OF COMPLIANCE .................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island,*
517 U.S. 484 (1996).................................................... 39

*Bad Frog Brewery v. N.Y. State Liquor Auth.,*
134 F.3d 87 (2d Cir. 1998) ............................ 33, 34, 35, 36

*Bd. of Trs. v. Fox,*
492 U.S. 469 (1989).................................................. 29, 30

*Bolger v. Youngs Drug Prods. Corp.,*
463 U.S. 60 (1983)................................................... 31, 34

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980)................................................. 30, 34

*Chamber of Com. v. SEC,*
85 F.4th 760 (5th Cir. 2023)....................................... 44

*Chooseco LLC v. Netflix, Inc.,*
439 F. Supp. 3d 308 (D. Vt. 2020)............................... 34

*Clear Channel Outdoor, Inc. v. City of N.Y.,*
594 F.3d 94 (2d Cir. 2010) ......................................... 29

*Cmty. Hous. Improvement Program v. City of N.Y.,*
59 F.4th 540 (2d Cir. 2023) ........................................ 48

*CompassCare v. Hochul,*
125 F.4th 49 (2d Cir. 2025) ...............................*passim*

*Conn. Bar Ass'n v. United States,*
620 F.3d 81 (2d Cir. 2010) ......................................... 30

*Edenfield v. Fane,*
507 U.S. 761 (1993)..................................................... 55

*Edwards v. District of Columbia,*
755 F.3d 996 (D.C. Cir. 2014) ................................ 48, 54

*Fitzgerald v. Racing Ass'n,*
539 U.S. 103 (2003)..................................................... 49

## TABLE OF AUTHORITIES (cont'd)

Page(s)

*Full Value Advisors, LLC v. SEC,*
  633 F.3d 1101 (D.C. Cir. 2011) ................................................ 43

*IMS Health Inc. v. Sorrell,*
  630 F.3d 263 (2d Cir. 2010) .............................................. 34, 36, 42

*Lewis v. Thompson,*
  22 F.3d 567 (2d Cir. 2001) ........................................................ 48

*Lorillard Tobacco Co. v. Reilly,*
  533 U.S. 525 (2001).................................................................. 55

*Md. Shall Issue, Inc. v. Anne Arundel Cnty.,*
  91 F.4th 238 (4th Cir. 2024).............................................. 35, 44

*Melendez v. City of N.Y.,*
  16 F.4th 992 (2d Cir. 2021) ...................................................... 48

*Meyer v. Grant,*
  486 U.S. 414 (1988)................................................................. 28

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024)................................................................. 35

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health,*
  556 F.3d 114 (2d Cir. 2009) ............................................*passim*

*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
  272 F.3d 104 (2d Cir. 2001) ............................................*passim*

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
  585 U.S. 755 (2018)................................................................. 47

*Nordlinger v. Hahn,*
  505 U.S. 1 (1992).................................................................... 49

*Ohio v. Am. Express Co.,*
  585 U.S. 529 (2018)................................................................. 36

*Ohralik v. Ohio State Bar Ass'n,*
  436 U.S. 447 (1978)................................................................. 29

*Riley v. Nat'l Fed'n of Blind,*
  487 U.S. 781 (1988)........................................................... 30, 44

iv

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*RJ Reynolds Tobacco Co. v. FDA,*
  96 F.4th 863 (5th Cir. 2024).............................................. 39, 43, 47

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.,*
  547 U.S. 47 (2006)........................................................................ 31

*Safelite Grp. v. Jensen,*
  764 F.3d 258 (2d Cir. 2014) ................................................ 40, 42, 45

*SEC v. AT&T, Inc.,*
  626 F. Supp. 3d 703 (S.D.N.Y. 2022) ............................................ 31

*Sensational Smiles, LLC v. Mullen,*
  793 F.3d 281 (2d Cir. 2015) ......................................................... 49

*Time Warner Cable Inc. v. FCC,*
  729 F.3d 137 (2d Cir. 2013) .............................................. 54, 56, 60

*Turner Broad. Sys. v. FCC,*
  512 U.S. 622 (1994)....................................................................... 50

*Va. Pharm. Bd. v. Va. Citizens Consumer Council, Inc.,*
  425 U.S. 748 (1976)....................................................................... 39

*Vugo, Inc. v. City of N.Y.,*
  931 F.3d 42 (2d Cir. 2019) ......................................... 54, 56, 57, 59

*Wandering Dago, Inc. v. Destito,*
  879 F.3d 20 (2d Cir. 2018) ........................................................... 38

*White Plains Towing Corp. v. Patterson,*
  991 F.2d 1049 (2d Cir. 1993) ....................................................... 29

*Zauderer v. Off. of Disciplinary Couns.,*
  471 U.S. 626 (1985)................................................................*passim*

**Statutes**

28 U.S.C. § 1291 .................................................................................. 4

28 U.S.C. § 1331 .................................................................................. 4

N.Y.C. Admin. Code § 20-563............................................................. 40

N.Y.C. Admin. Code § 20-563.7................................................. 1, 16, 53

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

**Other Authorities**

Fed. R. App. P. 4 .................................................................. 4

Grubhub, *Grubhub Completes Acquisition of Eat24*, Oct.
10, 2017 ........................................................................... 5

N.Y.C. Dep't of Consumer & Worker Prot., A Minimum Pay
Rate for App-Based Restaurant Delivery Workers in
NYC (2022) ..................................................................... 8

Robert Post, *Compelled Commercial Speech*, 117 W. Va. L.
Rev. 867 (2015) ............................................................ 43

Robert Post, *The Constitutional Status of Commercial
Speech*, 48 UCLA L. Rev. 1 (2000)........................... 29, 33

U.S. Const. amend. I.................................................*passim*

## PRELIMINARY STATEMENT

In recent years, third-party food delivery companies have surged in popularity in New York City. Bolstered by the shift to delivery and online orders following the COVID-19 pandemic, these companies have changed the traditional restaurant ecosystem by offering online platforms through which restaurant patrons can order food from a wide range of restaurants. But the convenience the companies offer comes at a cost. In an industry with already tight profit margins, restaurants that receive orders through these platforms must pay high commissions for every order. And as these delivery companies have grown more ubiquitous, many of them have sought ways to maintain their hold on the restaurant industry, including by refusing to disclose information to restaurants about the customers ordering their food. In doing so, third-party delivery companies cement their role in restaurants' businesses while cutting off those same restaurants from the patrons they serve.

To address this specific dynamic and support the restaurant industry that is vital to the City's economy and culture, in 2021 the New York City Council enacted a local law, codified at N.Y.C. Administrative Code § 20-563.7, that required third-party food delivery companies to comply with restaurant requests for certain limited data regarding their customers' orders (the "Customer Data Law")—customer names,

contact information, and order contents—unless the customer opts out. After multiple hearings and reports on this issue, the City Council determined that requiring food-delivery companies to share this data subject to customer opt-out would restore restaurants' connections with their most loyal customers and enable them to communicate to their customers through advertising, promotions, and the like.

The three largest delivery companies in New York City, plaintiffs DoorDash, Inc., Grubhub Inc., and Portier LLC (a subsidiary of Uber Technologies that does business as Uber Eats), sued the City of New York to enjoin enforcement of the Customer Data Law, raising a host of federal and state constitutional claims. The parties cross-moved for summary judgment, and the U.S. District Court for the Southern District of New York (Torres, J.) granted plaintiffs' motion only as to their First Amendment claim while denying their remaining claims as moot. This Court should reverse.

In granting plaintiffs' motion, the district court made multiple errors. The Customer Data Law is a market-focused regulation designed to enhance restaurants' opportunities to thrive despite the rise of third-party delivery services imposing increasing costs, and it does so by requiring the disclosure of purely factual commercial information in the form of a few data points about restaurant patrons and their orders. The

2

district court correctly recognized that the law regulates commercial speech, as its disclosure requirement involves an aspect of the business relationship between restaurants and the delivery platforms. Yet the court went on to apply the wrong First Amendment standard because it failed to appreciate the difference between a commercial *disclosure* requirement and a commercial-speech *restriction* under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). The former supports First Amendment goals by increasing the flow of information and is therefore subject to only rational basis review. And because the Customer Data Law reasonably relates to legitimate, indeed substantial, governmental interests in supporting a vital industry in the City as well as promoting fair competition in the changing restaurant business, the Customer Data Law satisfies the First Amendment.

What's more, if intermediate scrutiny applied, the Customer Data Law would satisfy that too. The legislative record clearly demonstrated the harms to restaurants from permitting third-party delivery companies to gatekeep the relationship between restaurants and their most loyal customers, and requiring disclosure of limited customer data effectively addressed those harms. Nor was the City required to adopt less effective hypothetical alternatives.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 over plaintiffs' First Amendment claims. The district court entered final judgment on December 5, 2024, and the City timely noticed its appeal on January 6, 2025 (Joint Appendix ("A") 10885). *See* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction over this appeal from the final judgment under 28 U.S.C. § 1291 (Special Appendix ("SPA") 2–7).

## ISSUE PRESENTED

Did the district court err by invalidating the Customer Data Law, a regulation mandating the disclosure of purely factual commercial speech, under the First Amendment?

## STATEMENT OF THE CASE

### A. The changing economic landscape for restaurants and the rise of third-party delivery upending traditional business models

The restaurant industry is a key part of the City's economic and cultural lifeblood (A574, 1386). In 2019, there were more than 23,600 food establishments in the City, from mom-and-pop restaurants to pinnacles of fine dining (A574, 1386). The vast majority are small businesses with fewer than 20 employees each (A573, 1386), yet the sector accounted for nearly $27 billion in sales and supported 317,800 jobs (A574, 1386). And while food delivery has been part of that economic

4

picture for many years, most of this revenue traditionally came through in-person, onsite sales (A1387–88). In 2016, delivery represented just seven percent of all U.S. sales (A1387–88).

That began to change just a few years ago as third parties like plaintiffs have captured more and more of not just the offsite market but the restaurant business overall. In 2015, for example, Americans ordered $210 billion of delivery or takeout, and delivery leaders Grubhub and Eat24—which Grubhub later acquired[1]—were associated with just over one percent of that amount, *i.e.*, $2.6 billion (A910, 1387). But as venture capitalists invested heavily in the sector—DoorDash alone raised nearly $2.5 billion through its initial public offering—the proportion of restaurant sales from food delivery steadily increased, as did the amounts paid to third-party delivery companies (A909, 1388). New Yorkers have also led this change, spending far more than residents of any other U.S. city on food ordered through third-party platforms (A523; *see* A1390 (citing N.Y.C. Dep't of Transp., Citywide Mobility Survey (2017), *available at* https://perma.cc/XEA9-3UFP) (majority of New Yorkers order delivery multiple times per month)).

---

[1] Grubhub, *Grubhub Completes Acquisition of Eat24*, Oct. 10, 2017, *available at* https://perma.cc/FS9A-QE65.

The COVID-19 pandemic supercharged these trends, driving an even greater explosion in food delivery. In just a few months in 2020, the use of third-party platforms skyrocketed to levels that had been expected to take years to reach as consumers relied more and more on takeout and delivery (A575–76, 1395 (citing Nat'l Rest. Ass'n, State of the Industry 2021, *available at* https://perma.cc/RRB3-NG7J)). Scholars and industry leaders, including Uber's CEO, viewed this shift in consumer behavior as permanent, even if pandemic restrictions had initially spurred the changes (A1395). Faced with pandemic pressures (A1624, 1649), restaurants also participated in the shift: nearly half of all full-service restaurants introduced delivery for the first time during the pandemic. Nat'l Rest. Ass'n, *supra*, at 9; A1396. Most often, these restaurants opted for third-party delivery—despite increased costs and customers preferring direct restaurant orders. *Id.* And even those restaurants that did not choose to be listed on third-party platforms sometimes found themselves there anyway, a practice that Grubhub in particular used to expand its reach despite acknowledging that it was "no doubt a bad experience for diners, drivers, and restaurants" (A1399–1402).

These changes generated spectacular rewards for third-party delivery companies like plaintiffs, but not for restaurants. Even before the

pandemic, 60 percent of consumers who ordered food for consumption outside the restaurant used third-party delivery services (A1388 (citing Hudson Riehle & Melissa Wilson, *Harnessing Technology to Drive Off-Premises Sales* 4 (2019), *available at* https://perma.cc/PB57-EYT3)), as restaurants faced increasing commission fees from delivery companies (*e.g.*, A1309–11). Delivery platforms then doubled their revenue during the pandemic, generating over $50 billion in sales in 2020 compared with under $23 billion the previous year—a $19 billion windfall compared with pre-pandemic expectations (A575, 792, 1396). Indeed, in a six-month span in 2020, major delivery platforms profited by $5.5 billion, compared with $2.5 billion during the same months in the previous year (A525, 575–76).

Those profits concentrated further benefits for these companies: for example, Uber acquired delivery competitor Postmates, and Door-Dash saw its stock rise 86 percent during its initial public offering (A1397). And the shift towards these platforms has proven long-lasting: between March 2021 and May 2022, third-party delivery alone accounted for 15% ($3.6 billion) of New York City restaurant sales, a

substantial proportion of the traditional restaurant business.[2] N.Y.C. Dep't of Consumer & Worker Prot., A Minimum Pay Rate for App-Based Restaurant Delivery Workers in NYC 6 (2022), *available at* https://perma.cc/KZC6-W949.

At the same time, many restaurants struggled (A1397). Grubhub's CEO reported that many more restaurants were joining its platform, but even he acknowledged that delivery could not sustain a restaurant long term (A1397–98). High operating costs for restaurants, including rent, labor, and inventory, leave little room for paying third-party delivery commissions (A912, 1327–29, 1397). And while increased delivery sales can generate extra revenue, those sales cannot replicate the greater profits from onsite business (A1398). Indeed, 65 percent of restaurant owners in the City who increased deliveries during the pandemic said that those sales made up for less than 30 percent of lost onsite sales (A1398). And given these platforms' fees, ranging as high as 30% per order, third-party delivery orders generate less revenue for restaurants than other orders, and may even result in a net loss to restaurants to the

---

[2] The $3.6 billion figure does not include orders placed through third parties for consumer pickup or delivery by a restaurant employee, which account for an additional share of sales through third-party platforms.

extent they replace other sales (*see, e.g.*, A1526, 1617, 1620–27, 1633, 1639).

## B. The New York City Council's inquiry into the impact of third-party delivery on restaurants and consideration of the Customer Data Law

Recognizing the challenges to restaurants from the rise of third-party delivery companies, the New York City Council in 2019 began examining legislative solutions to promote the continued viability of the restaurant industry (A1182). Remarks before the Committee on Small Business at that time demonstrated that while third-party platforms could provide valuable services, their rising popularity also risked creating "a system where restaurant owners are caught in an unsustainable business model" (*e.g.,* A1189, 1311 (City Council Chairperson Mark Gjonaj's report of stakeholder concerns, including that third-party delivery was "Trojan horse" in restaurant industry); A1327–30 (testimony from U.S. Small Business Administration describing "downward spiraling of economics of running a restaurant" because of third-party delivery). Indeed, although restaurant profit margins generally ranged from 2 to 8 percent of sales, delivery companies were charging between 10 and 30 percent commissions while simultaneously preventing restaurants from charging more for delivery to recoup those costs (A1197–99,

9

1204, 1349–50 (testimony from New York City Department of Small Business Services and individual restaurant owner)).

At the same time, restaurants faced challenges terminating their relationships with third-party platforms given the platforms' monopoly over customer data (A1211, 1215 (testimony from New York City Hospitality Alliance)). In general, delivery companies collected data on those who placed orders—such as customer names, order history, and contact information—without sharing that information with the restaurants each customer was ordering from (*id.*). As a result, leaving a third-party delivery platform often meant losing access to those customers (*id.*). And, these platforms could use data on customers' preferences to promote competitors, including those willing to pay higher commissions, or to otherwise encourage customers to forgo direct orders from restaurants in favor of ordering through third-party platforms (A1215; A1355, 1359 (testimony from restaurant owner)). Restaurants without access to data on their customers could not counteract those adverse marketing efforts, which was necessary to "level the playing field" (A1355–59, 1361–62).

The City Council renewed its efforts to address these concerns during the COVID-19 pandemic. In 2021, the City Council began to consider a suite of new bills addressing third-party delivery and its impact

10

on the restaurant industry, including what would become the Customer Data Law. That law would require food-delivery services to share some of the customer data that they had monopolized, including the name, contact information, and order contents for a restaurant's customers (A547, 568). The Customer Data Law was thus limited to the same categories of information that would typically be available to a restaurant that took a delivery order directly (A797 (Councilmember Keith Powers's description of his work in a restaurant)), and not the much broader information that many third-party delivery companies had been known to collect, including personal data on customers' mobile devices and social media accounts (A576–81 (2021 City Council report)).

The City Council's Committee on Consumer Affairs and Business Licensing issued a June 2021 report describing the need for the Customer Data Law, incorporating many of the concerns that had been evident since 2019. The report explained that delivery companies had been requiring restaurants to agree to "exploitative contract terms," including limitations on restaurants' ability to "retain data on their own customers" who ordered food from them (A529). Many third-party delivery companies instead kept this data for themselves (A530), leaving restaurants with "no record of the specific customers placing repeat orders" (A531).

Data left only in the hands of delivery companies also may harm restaurants. While this data enabled third-party delivery companies to create efficiencies in their delivery services, delivery companies could use the knowledge of individual customer preferences to recommend competitors, particularly those who agreed to pay higher commission fees (A531–32).

At the same time, this data was also valuable to restaurants. Studies showed that 80 percent of a restaurant's business comes from just 20 percent of its customers (A530, 794). Access to customer data would allow restaurants to identify these loyal patrons and engage in targeted marketing while also encouraging new customers to reorder, including by offering incentives for repeat business (A530). The data would also allow restaurants to better understand their businesses and to develop closer relationships with their clientele (A530).

Following the June 2021 report, written and live testimony to the City Council emphasized the benefits of the law, as well as the harm to restaurants if third-party delivery companies continued to deny access to this data. The bill's sponsor described the law as seeking to "strike the right balance" between delivery companies and restaurants by requiring greater transparency (A661). Doing so would give restaurants a better opportunity to stay in business (A661–62).

For instance, both the New York State Restaurant Association and the New York City Hospitality Alliance submitted testimony describing how pandemic restrictions had forced many restaurants to offer delivery, but the reduced profit from that option placed restauranteurs in a "can't live with it, can't live without it" position (A595, 599, 729, 734). And third-party delivery companies' retention of customer data represented a particularly "exploitative dynamic" (A595, 735). Monopolizing that information put restaurants "at arm's length from their customers, even repeat customers, even their regulars," because platforms refused to share that data (A595). That data was necessary for restaurants to "cultivate lasting relationships with the customers and their community," including by offering them deals or other direct marketing (A595, 599). Yet delivery companies were "gate keeping" that information, notwithstanding that it was the quality of the restaurants' products that kept customers coming back, including to the third-party platforms themselves (A595–96).

What's more, without this customer data, many restaurants were "unable to leave the delivery platforms" out of concern that they would "lose access to their own customers" (A599). Indeed, a restaurant leaving a platform faced enhanced risk because delivery companies could still use that restaurant's data to identify the restaurant's best customers

and their preferences. And that data would allow third-party delivery platforms to direct those customers to a restaurant's competitors, particularly if that restaurant no longer appeared on the delivery company's platform (A595, 729).

During and after the June 2021 hearing, plaintiffs and others objected to the Customer Data Law, citing concerns that included "customer privacy" and security if this data was shared with restaurants without customers' consent (A606–63 (DoorDash); A608(Grubhub); A611 (Uber Eats); *see also, e.g.*, A631 (Electronic Frontier Foundation); A4440–49 (describing additional objections)). Plaintiffs also engaged in extensive lobbying of the City Council seeking amendments addressing these concerns (*see, e.g.*, A4792–99).

## C. The City Council's enactment of the Customer Data Law

Following the June 2021 hearing, the proposed Customer Data Law was amended to address some of the concerns raised. Under the revised bill, third-party platforms would be required to explain to consumers the data that could be shared and provide them the ability to opt out, thus ensuring that such sharing occurred only with consent (A582–83, 798, 4800–03; SPA41, 43 (statutory text)). Customers could withdraw their consent at any time and require restaurants to delete their

14

information upon request (A582). Moreover, third-party platforms would also be required to provide customer data only upon restaurants' request, instead of automatically (A583). And restaurants would be prohibited from selling, renting, or otherwise disclosing customer information to others absent "express" customer permission (A582).

The City Council committees considering the Customer Data Law issued a July 2021 report accompanying the revised bill. The report described the market conditions affecting restaurants, including the explosive growth of third-party delivery companies (A573–81). The report also detailed how delivery platforms, including plaintiffs, had been collecting and using customer data, including for marketing purposes as explained above (A575–79). And the report again emphasized that almost no customer data was generally shared with restaurants, the engines of the food-delivery economy, notwithstanding that those placing orders through third-party companies were "clearly customers of the restaurants from which they order" (A578, 580).

The report also reiterated the risks to restaurants if they left third-party delivery platforms without their customer data, which the platforms could use to advertise these platforms' preferred competitors, including those who paid additional fees (A579). At the same time, the report observed, it was typical for third-party delivery companies to

refuse to share customer data with restaurants while collecting and disclosing this information to other third parties (A577 (citing Ivan Dimitrov, pCloud, *Invasive Apps*, Mar. 5, 2021, *available at* https://perma.cc/D5FU-SW3Y; Jason Cohen, Social Media and Food Delivery Apps Sell the Most Personal Data, *PCMag*, Mar. 12, 2021, *available at* https://perma.cc/9X7A-LH2G (describing Uber Eats and Grubhub as among "the worst offenders")).

After issuing its report, the City Council passed the Customer Data Law by a wide margin in July 2021, and it became law soon thereafter (A4825, A8450–51). In passing the local law, the bill's sponsors emphasized the critical role that restaurants play in the City's economy and the need to prevent food-delivery platforms from being "the exclusive gatekeepers" of this valuable information (A790–97). Customers were purchasing the product of the restaurants' labor, and so restaurants should have "the right to know who their loyal customers are" (A794). The bill was also "crucial for the survival of the restaurant industry" (A794).

After the Customer Data Law was enacted, it was recodified in relevant part at N.Y.C. Administrative Code § 20-563.7 pursuant to Local Law 100 of 2021 (A4825–86; 8413). Under that recodification, the City Council also issued another report reiterating and further explaining the changing economic dynamics between third-party delivery and

restaurants that had motivated the need for legislative intervention (A1384–1414).

### D. Plaintiffs' commencement of this litigation and their practices concerning customer data

Plaintiffs Grubhub, DoorDash, and Portier (which does business as Uber Eats) operate the three dominant third-party delivery platforms in New York City, and each accounts for approximately a third of all online restaurant delivery sales (A575, 4535, 4833). Each sued to enjoin the Customer Data Law, and their lawsuits were consolidated in the current action. According to plaintiffs, the Customer Data Law violates the First Amendment as well as other federal and state constitutional provisions. The parties stipulated that the City would not enforce the new law against plaintiffs pending a judicial determination of their claims (*e.g.*, SDNY 21-cv-07695; ECF No. 29; SDNY 21-cv-10347 ECF No. 15; SDNY 21-cv-10602 ECF No. 19).

Plaintiffs do not dispute that the information subject to disclosure under the Customer Data Law is valuable to both plaintiffs and restaurants. And so, according to plaintiffs, they typically seek to withhold that data unless they would gain an economic benefit from disclosing it (A4480–81, 4519–20, 4965–66 (testimony that DoorDash "wouldn't give away [customer data] for free" to restaurants), 4546–52, 4617–18,

17

8608–10 (Uber Eats data practices); A4683–85 (Grubhub practices)).

Thus, when a customer places an order on plaintiffs' online platforms

listing restaurants and their menus—which each plaintiff refers to as

their Marketplace offering—plaintiffs for the most part transmit only

limited customer data to the restaurant, generally including the cus-

tomer's first name, last initial, and the contents of the order (A575,

4504–06, 4592, 4595, 4619–24, 4540, 4588, 4653, 4844–45, 4852,

4857, 4859–61, 8457–58 (Uber Eats); A4909–10, 4917, 4934–95,

8456 (DoorDash); A4617, 4677–78, 4978, 4984–85, 5001–02 (Grub-

hub)).

Plaintiffs also typically restrict what restaurants may do with that

data and place time limits on how long it may be retained. For example,

DoorDash generally requires restaurants to agree "not to access, collect,

store retain, transfer, use, disclose, or otherwise process" customer data

they receive except to fulfill the order (A4505–06, 4512–13). Restau-

rant agreements with Uber Eats prohibit the retention of customer data

"for longer than it takes to fulfill" the order and allows the use of cus-

tomer data "solely for the purpose" of order fulfillment (A4861–62).

And Grubhub's typical agreements similarly permit restaurants to use

customer data "for the sole purpose of fulfilling customer orders" or to

18

otherwise satisfy the restaurant's contractual obligations (A4997–5000).

But there are also many circumstances under which plaintiffs voluntarily disclose the types of customer data at issue, including to restaurants and other third parties. For example, plaintiffs offer services to restaurants that give them access to additional customer data, including the option to have plaintiffs create an ordering platform on restaurants' websites that allow customers to place orders directly with restaurants (A4497–99, A4910, 4947–50, 8459 (DoorDash Storefront); A4599–601, 4610, 4656, 4904, 8602, 8867–72 (Uber Eats Webshop); A4674–75, 4689–90, 4978, 5009–12 (Grubhub Direct)). Restaurants that agree to only that arrangement would not appear on plaintiffs' broader Marketplace platforms, nor would restaurants have access to customer data generated from past orders if they transitioned from a Marketplace platform to one of these products.

Plaintiffs have also agreed to disclose customer data to certain restaurants, including complete information regarding the customer's identity and their orders (A4515–16, 4519, 4614–16, 4626–32, 4841, 4863–65, 4873 (Uber Eats); 4690–92, 4700–07 (Grubhub); A4937–38, 5003–07, 8930–34, 8999–9000 (DoorDash)). The agreements that expressly permit this data sharing are generally limited to large enterprise

19

businesses with numerous locations and large geographic footprints (A4515–17 (DoorDash); A4616–18, 4626–27 (Uber Eats); 4700–07 (Grubhub)).

Plaintiffs also collect and disclose large amounts of customer data to third parties in many circumstances. That includes information beyond order information that customers input, such as location data, device data, and social media information. Plaintiffs then share this information with many different types of third parties, which can include not just delivery providers and service providers supporting plaintiffs' products, but also advertising networks, social media companies, Google, and others (*e.g.*, A4521, 4523–24, 4965–66 (DoorDash); A4558–61, A4889–96 (Uber Eats); A4693, 4723–24, 5020–22 (Grubhub)).

### E. The parties' cross-motions for summary judgment and the district court's erroneous First Amendment determination

After several months of discovery, plaintiffs moved for summary judgment. As to their First Amendment claim, plaintiffs argued that the Customer Data Law was a content-based regulation of noncommercial speech and failed strict scrutiny. And, even if the Customer Data Law did compel the disclosure of commercial speech, plaintiffs argued, the law also did not satisfy any other level of constitutional scrutiny.

20

The City opposed plaintiffs' motion and cross-moved for summary judgment dismissing each of their claims. Regarding the First Amendment, the City argued, *inter alia*, that neither strict scrutiny nor intermediate scrutiny applied because the Customer Data Law compelled the disclosure of only factual, uncontroversial information concerning the customers placing orders from restaurants. To the extent that this type of disclosure constituted speech at all, it was commercial speech, and therefore the law should be evaluated only for a rational basis. No evidence or empirical data was necessary for that analysis, and because the Customer Data Law addressed the unfair business practices of third-party food delivery services, helped bolster a vital City industry, and was not more extensive than necessary, the law satisfied the First Amendment. The City also argued that even if intermediate scrutiny applied, the Customer Data Law satisfied that standard too.

The district court granted plaintiffs' motion for summary judgment on First Amendment grounds and denied the City's cross-motion. While the court agreed with the City that the Customer Data Law concerned commercial speech because the compelled disclosure "occurs in the context of a commercial transaction" and was economically valuable

21

to both plaintiffs and restaurants (SPA30 (cleaned up)),[3] the court declined to examine the law for a rational basis. According to the court, heightened scrutiny applied because the Customer Data Law required only a narrow disclosure to individual restaurants instead of "to the general public" at large (SPA31). In addition, the rational basis test did not apply because the data did not concern "the terms under which Plaintiffs' services will be available" (SPA32).

In the court's view, the Customer Data Law did not satisfy intermediate scrutiny. Although the court acknowledged that "promoting a major industry" that contributed to the City's "economic vitality" was a "substantial government interest," the City had not provided "evidence" demonstrating that the Customer Data Law would have an impact on any of the harms from the exploitative practices that the City Council had identified (SPA33–34). That included the injury to restaurants from being unable to contact their customers directly, to analyze their preferences, or to counteract plaintiffs' use of that data to promote competitor restaurants. Instead, because the Customer Data Law did not actually prevent plaintiffs from promoting competitors, and plaintiffs also offered data analytic tools as well as means to contact customers through

---

[3] This brief uses "cleaned up" to indicate that internal quotation marks, alterations, or citations have been omitted from quotations.

plaintiffs' platforms, the Customer Data Law's impact on these harms was too "remote" (SPA35). According to the court, it was not enough that the Customer Data Law also aided restaurants seeking to leave plaintiffs' platforms if they chose (SPA35), thereby avoiding the extra costs from commission fees that threatened at least some restaurants' financial viability.

The court thus concluded that the Customer Data Law violated the First Amendment and permanently enjoined the law as it applied to plaintiffs' Marketplace platforms—*i.e.*, plaintiffs' online and mobile platforms that offer a centralized listing of restaurants and that allow patrons to order food from restaurants through plaintiffs. Because none of plaintiffs' remaining claims could grant them additional relief, the court denied those claims as moot.

## STANDARD OF REVIEW AND SUMMARY OF ARGUMENT

On de novo review, *see CompassCare v. Hochul*, 125 F.4th 49, 56 (2d Cir. 2025), the Court should reverse the district court's grant of summary judgment to plaintiffs on their First Amendment claim. While the district court properly concluded that the Customer Data Law regulated commercial speech, the court failed to apply the rational basis test for regulations that mandate the disclosure of factual, non-controversial

23

information as part of commercial speech. Instead, the court improperly applied intermediate scrutiny, which this Court has repeatedly held is reserved for regulations *restricting* commercial speech, rather than for straightforward disclosure requirements. And the district court also misapplied the intermediate scrutiny standard in any event.

To start, the district court properly concluded that the Customer Data Law regulated only commercial speech. Commercial speech includes "expression related solely to the economic interests of the speaker and its audience." *CompassCare*, 125 F.4th at 64. Information identifying customers, their contact information, and the orders they placed with restaurants falls squarely within that definition. And plaintiffs have never claimed any ideological valence regarding that data, which even they disclose to other parties, including restaurants, for the right price.

But the district court failed to follow that conclusion to its logical end by reviewing the Customer Data Law only for a rational basis. Under well-established precedent, that deferential form of scrutiny is warranted for governmental regulations that require the disclosure of simple objective information as a matter of commercial speech because increasing the amount of such information available serves core First Amendment interests. *See Zauderer v. Off. of Disciplinary Couns.*, 471

U.S. 626 (1985). Nor does a purely factual commercial disclosure force the speaker to adopt the government's view on an issue of public concern that would warrant more exacting scrutiny.

In concluding that the Customer Data Law did not advance those purposes, the district court misunderstood the relationship between plaintiffs, restaurants, and their customers. To be sure, restaurant patrons are the restaurants' customers. But when third-party delivery companies offer themselves as matchmakers to connect patrons with restaurants, there is an additional business relationship in play. Restaurants are also consumers of plaintiffs' services, and the product that plaintiffs offer to restaurants is access to additional customers and their orders. Requiring plaintiffs to disclose more information about that transaction in the form of customer data supports the information-promoting function that *Zauderer* and its progeny have long recognized. Moreover, plaintiffs' grievance is that the required disclosure pares their profits, and not that it muddies their message, coerces confession of beliefs against their conscience, or strikes at other free-speech values.

And under the rational basis standard that *Zauderer* prescribes, the Customer Data Law accords with the First Amendment. Ensuring the viability of the restaurant industry in New York City while empowering restaurants to cultivate direct relationships with their patrons

advances not just legitimate, but substantial, interests. The Customer Data Law is also reasonably related to those interests in that it removes a barrier that plaintiffs have erected between restaurants and the patrons that they serve. By doing so, the law enables restaurants to communicate directly with those customers, including through speech that allows them to counteract plaintiffs' use of data about their businesses to promote their competitors.

Nor is the law unjustified or unduly burdensome for purposes of rational basis scrutiny under *Zauderer*. The law requires plaintiffs to share only a narrow slice of customer information that pales in comparison to the vast amount of data that they collect across restaurants, customers, and geographies, including personal data regarding customers' online activities that has nothing to do with a particular restaurant order. Restaurants may use only that information that relates to their business, and only if the restaurant patron does not opt out, further demonstrating the law's narrow focus on the particular harms from plaintiff's business practices.

For similar reasons, even if intermediate scrutiny did apply, the Customer Data Law would satisfy it. Not only does the law serve substantial government interests, but the Customer Data Law resulted from the City Council's close examination of the rise of third-party delivery

companies and their impact on the restaurant industry. By targeting the specific harms from withholding this information, including the tremendous costs to restaurants from leaving plaintiffs' platforms without access to their customer base, the law is no broader than necessary and would satisfy even heightened First Amendment scrutiny.

Not so long ago, restaurants reliably had direct interactions with their customers. In-restaurant dining and takeout certainly fit that description. Food delivery service did too—potential customers perused paper menus that the restaurants distributed and placed orders by phone to their chosen restaurant. But things have changed: now massive delivery platforms mediate many of these interactions. That change has produced positives, to be sure. But it has also meant that restaurants have become cut off from relationships with their customers. The local law at issue here strives to restore an element of those relationships, and it does not violate the First Amendment.

## ARGUMENT

### THE CUSTOMER DATA LAW DOES NOT VIOLATE THE FIRST AMENDMENT

As a commercial-speech disclosure requirement, the Customer Data Law satisfies the First Amendment so long as it is rationally related to a legitimate government interest and is not unjustified or unduly

burdensome. While the district court properly concluded that the law regulated commercial speech, the court erroneously applied the heightened scrutiny applicable to *restrictions* on commercial speech. Under the proper standard, the Customer Data Law satisfies the First Amendment by empowering restaurants to once again develop relationships with the customers that they serve and giving restaurants the tools to generate additional speech that may counteract some of the harmful practices of third-party delivery companies, all with the goal of maintaining the vitality of the restaurant industry, which is a key part of the City's economy and culture. For many of the same reasons, the local law would satisfy intermediate scrutiny if that showing were required.

### A. The Customer Data Law regulates only commercial speech, which receives only limited First Amendment protection.

The extent to which the First Amendment limits governmental regulation depends on both the type of speech at issue and the nature of the regulation. The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Meyer v. Grant*, 486 U.S. 414, 421 (1988) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). And so, First Amendment protections are greatest regarding expression

relating to matters of public concern, *e.g.*, *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir. 1993), as well as "political or religious speech," *Clear Channel Outdoor, Inc. v. City of N.Y.*, 594 F.3d 94, 104 n.11 (2d Cir. 2010); *see* Robert Post, *The Constitutional Status of Commercial Speech*, 48 UCLA L. Rev. 1, 4, 14 (2000) (hereinafter Post, *Constitutional Status*) (explaining that "core First Amendment protections" extend to "public discourse" that is "necessary to ensure that a democratic state remains responsive to the views of its citizens").

By contrast, the Supreme Court has identified speech outside the First Amendment's core that the government may regulate more closely. That includes commercial speech, which, unlike other areas of speech, has been "traditionally subject to government regulation." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). Extending the First Amendment to commercial speech at all is "justified principally by the value to consumers of the information such speech provides." *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985) (citing *Va. Pharm. Bd. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)). Accordingly, the First Amendment provides only "a limited measure of protection" to commercial speech, "commensurate with its subordinate position in the scale of First Amendment values." *Bd. of Trs. v. Fox*, 492 U.S. 469, 477 (1989). Governments may thus regulate

29

commercial speech in a manner that "might be impermissible in the realm of noncommercial expression," *id.*, including by imposing "compelled disclosure requirements," *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 796 n.9 (1988).

To distinguish between commercial and noncommercial speech, this Court has explained that the "lodestars" are "the nature of the speech taken as a whole" and "the effect of the compelled statement" on a speaker's "otherwise fully protected speech." *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 94 (2d Cir. 2010) (quoting *Riley*, 487 U.S. at 796). Under well-established precedent, commercial speech is thus defined broadly to include advertisements as well as "expression related solely to the economic interests of the speaker and its audience." *CompassCare v. Hochul*, 125 F.4th 49, 64 (2d Cir. 2025) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980)). And while not every statement relating to a "financial motivation" is necessarily commercial if it is "inextricably intertwined with otherwise fully protected speech," *Riley*, 487 U.S. at 795–96, speech "does not cease to be commercial merely because it alludes to a matter of public debate," *Conn. Bar*, 620 F.3d at 94. Thus, statements made "in the context of commercial transactions" are commercial speech, even if they

refer to "public issues." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983).

Here, the customer data required to be privately disclosed to restaurants who received that customer's order related only to plaintiffs' and restaurants' "economic interests," thus qualifying as commercial speech. *CompassCare*, 125 F.4th at 64. Plaintiffs have never claimed an ideological interest in the customer data at issue—instead, they have consistently urged that this data's significance relates only to its economic value for marketing purposes and for its use in plaintiffs' business.

Indeed, plaintiffs' established practice of disclosing this data if they deem it economically beneficial to do so confirms its commercial nature. *See Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (compelling speech that a party already provides to others supports regulation's constitutionality); *SEC v. AT&T, Inc.*, 626 F. Supp. 3d 703, 750 (S.D.N.Y. 2022) (compelling disclosure that company has "already chosen to make to a subset of the market" did not warrant heightened scrutiny). Plaintiffs already disclose much of the data at issue to restaurants for purposes of order fulfillment, including first name, last initial, order contents, and delivery address (if necessary to fulfill the order) (A4505–06, 4510, 4558, 4653, 4655, 4690–91).

That the Customer Data Law allows restaurants to receive somewhat more data, and to keep it and use it for their own purposes, doesn't change its fundamental nature.

What's more, each plaintiff voluntarily provides additional customer data to restaurants that are willing to pay for it or that provide other valuable consideration (like exclusivity agreements). And for restaurants that allow plaintiffs to create a direct-ordering platform (through DoorDash's Storefront, Uber Eats' Webshop, or Grubhub Direct, and for which plaintiffs collect fees), plaintiffs allow customer data to pass through to restaurants and do not assert a right to maintain control over it. Nor can plaintiffs dispute that they disclose customer data to advertisers, social media companies, service providers, and others when economic circumstances warrant. Plaintiffs themselves describe customer data as an economic asset (*e.g.*, A4154, 4519–20, 4617, 4686) and so are hard-pressed to dispute that it falls squarely within established commercial-speech doctrine.

Similarly, this information also relates to restaurants' economic interests. As explained above, the First Amendment offers protection to commercial speech primarily based upon the value to the listener—here, restaurants—of unrestricted information. *See, e.g.*, *CompassCare*, 125 F.4th at 64 (speech is commercial if it relates to the economic interests

of its "audience"); *see* Post, *Constitutional Status*, *supra*, at 14 (commercial speech doctrine is "sharply audience oriented"). And as the legislative record makes clear, the purpose of the Customer Data Law is to allow restaurants to use this data to target their own advertisements, to gather information about customer preferences to make their businesses more profitable, and to limit the financial harm to restaurants should they choose to leave plaintiffs' platforms (A529–31, 578–80). This data thus plainly constitutes commercial speech.

Before the district court, plaintiffs disputed the commercial nature of customer data, but they misread this Court's jurisprudence. They relied on this Court's decision in *Bad Frog Brewery v. New York State Liquor Authority*, 134 F.3d 87 (2d Cir. 1998) (*see, e.g.*, SDNY 21-cv-07695 ECF No. 152 at 30–31), but *Bad Frog* concerned speech that "combine[d] commercial and noncommercial elements"—in that case, a beer label that the plaintiff claimed also conveyed social commentary, 134 F.3d at 96–97. To determine whether this label was nevertheless commercial, the Court applied a multifactor test that included "whether the communication is an advertisement, whether the communication makes reference to a specific product, and whether the speaker has an economic motivation for the communication." *Id*. at 97.

That analysis is inapplicable here. Plaintiffs do not claim that the information required to be disclosed implicates any form of social commentary or addresses any matter of public concern—nor could they. *Bad Frog* did not purport to announce a new rule for such commercial speech that lacks any noncommercial element. *See, e.g.*, *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 274 (2d Cir. 2010) (citing *Bad Frog* in relation to contention that commercial speech was "inextricably intertwined" with noncommercial elements), *aff'd*, 564 U.S. 552 (2011); *Chooseco LLC v. Netflix, Inc.*, 439 F. Supp. 3d 308, 324 (D. Vt. 2020) (*Bad Frog* analysis applies in "hybrid situations" for combined commercial and noncommercial speech). By contrast, as this Court and the Supreme Court have repeatedly made clear, "expression related solely to the economic interests of the speaker and its audience" is commercial speech, *CompassCare*, 125 F.4th at 64 (quoting *Cent. Hudson*, 447 U.S. at 561), as are many other statements that include noncommercial elements, *see Bolger*, 463 U.S. 60 (advertising for contraceptives was commercial speech despite including discussion of "important public issues" like "family planning").

Indeed, this Court has repeatedly identified commercial speech without applying *Bad Frog*. For example, the Court concluded that a law requiring employers to disclose employees' rights under an

34

antidiscrimination law regulated only commercial speech because that disclosure was "a far cry from the sort of mandated 'confession' of 'what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *CompassCare*, 125 F.4th at 64–65 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Similarly, this Court did not apply *Bad Frog* to hold that calorie information disclosed "in connection with" the sale of a restaurant meal was commercial speech. *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114, 131–32 (2d Cir. 2009); *see Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F.4th 238, 248 (4th Cir. 2024) (speech "connected with the sale of a good or a service" is commercial because "it assists consumers and furthers the societal interest"); *cf. Moody v. NetChoice, LLC*, 603 U.S. 707, 725, 727 n.3 (2024) (*Zauderer* commercial-speech standard applied to requirement that social-media platforms provide "individualized explanation[s]" for editorial decisions). The Customer Data Law similarly concerns only "factual and uncontroversial information" about an economic transaction—a restaurant order made through plaintiffs' platforms—and no further inquiry is required to conclude that the law regulates commercial speech. *CompassCare*, 125 F.4th at 65.

In any event, if *Bad Frog* applies, the customer data here satisfies that test too. As noted, that test looks to (1) whether the speech is an

35

advertisement, (2) whether it refers to "a specific product," and (3) the speaker's "economic motivation." *Bad Frog*, 134 F.3d at 97. To the first factor, this data is closely related to advertising and enables both plaintiffs and restaurants to generate more effective marketing by incorporating known consumer preferences. *See, e.g.*, *IMS Health*, 630 F.3d at 274 (that data was "a step in a chain intended to influence marketing efforts" suggested it was commercial speech).

To the second factor, the data here concerns both the services that restaurants purchase from plaintiffs as well as the products offered to those restaurants. Plaintiffs offer restaurants the ability to appear on their ordering platforms based on plaintiffs' ability to deliver more customers to those restaurants. Data regarding those customers thus directly relates to both the services that restaurants are receiving from plaintiffs as well as the "specific product" offered: access to the customers and their orders. That is so even though the platforms also provide a service to the restaurant patrons placing the orders. *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529, 534 (2018) (describing "two-sided platform[s]" that offer "different products or services to two different groups who both depend on the platform to intermediate between them").

As to the third factor, an "economic motivation" also clearly drives whether to disclose this information. Again, plaintiffs sell this

36

information for the right price to restaurants and similarly disclose this data when it serves their economic interests. Plaintiffs may resist the requirement to disclose the data under the Customer Data Law, but this Court has not hesitated to conclude that a disclosure constituted commercial speech where a plaintiff's real objection to disclosure was that a speech regulation economically impacted what they considered their property. *See, e.g., Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 114–15 (2d Cir. 2001) (requiring manufacturers to disclose mercury content of their products was commercial speech notwithstanding alleged "property" impact). Thus, under any test, customer data is commercial speech.

**B. Because it requires the disclosure of only accurate, factual commercial information, the Customer Data Law is subject only to rational basis scrutiny.**

While the district court properly concluded that the Customer Data Law implicated only commercial speech, the court failed to apply the correct level of scrutiny. As a law requiring disclosure of straightforward, uncontroversial factual information in a commercial-speech context, it is appropriately analyzed for a rational basis under *Zauderer*. The court therefore mistakenly applied heightened scrutiny.

37

To be sure, where commercial speech is not involved, "compulsion to speak may be as violative of the First Amendment as prohibitions on speech," such as mandates "prescrib[ing] what shall be orthodox in politics, nationalism, religion, or other matters of opinion or forc[ing] citizens to confess by word or act their faith therein." *Zauderer*, 471 U.S. at 650–51 (quoting *Barnette*, 319 U.S. at 642). And when the government engages in viewpoint discrimination by "disfavor[ing] certain speech because of 'the specific motivating ideology or the opinion or perspective of the speaker,'" more exacting scrutiny also applies even if commercial speech is involved. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31 (2d Cir. 2018) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

But commercial disclosure requirements like the Customer Data Law are different. "[M]andated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests." *Nat'l Elec. Mfrs.*, 272 F.3d at 114. Instead, "requiring disclosure of truthful information" *promotes* the core First Amendment goal of protecting "the robust and free flow of accurate information." *Id.* Indeed, the principal reason that commercial speech receives First Amendment protection at all is for its value to recipients. *Zauderer*, 471

U.S. at 651; *see Va. Pharm. Bd.*, 425 U.S. at 770 ("[P]eople will perceive their own best interests if only they are well enough informed, and … the best means to that end is to open the channels of communication rather than to close them."). Requiring commercial disclosure thus "furthers, rather than hinders, the First Amendment goal of the discovery of truth" while contributing to "the efficiency of the marketplace of ideas." *Nat'l Elec. Mfrs.*, 272 F.3d at 114 (cleaned up).

For that reason, "regulations that compel purely factual and un-controversial commercial speech" are subject to the "rational basis test." *Rest. Ass'n*, 556 F.3d at 132 (cleaned up); *see CompassCare*, 125 F.4th at 64. As a commercial disclosure requirement, the Customer Data Law thus satisfies the First Amendment if there is "a rational connection" between its purpose and "the means employed to realize that purpose." *Nat'l Elec. Mfrs.*, 272 F.3d at 115; *see 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (plurality op.) (laws mandating "disclosure of beneficial consumer information" require "less than strict review"); *RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 877 (5th Cir. 2024) (*Zauderer* rational basis scrutiny applies to "purely factual" and "uncontroversial" disclosures).

In refusing to apply the rational basis test, the district court ig-nored the distinction between regulations compelling commercial

39

speech and those restricting that speech. According to the district court, heightened scrutiny applied because the Customer Data Law required disclosing customer data to individual restaurants, which the court deemed plaintiffs' "competitors," instead of to "the general public" (SPA31). But this reasoning is flawed both because the court's premise is mistaken, and because the premise doesn't support the court's conclusion in any event.

First, the court was wrong: restaurants are not plaintiffs' competitors, at least insofar as the Customer Data Law is concerned. The data subject to the law is only what's provided by a "customer who has placed an online order," defined as an order placed "with the assistance of a third-party food delivery platform" like those operated by plaintiffs (SPA41). Admin. Code § 20-563. This data is thus gathered in connection with the service that plaintiffs provide to restaurants by agreement, and it relates directly to the product delivered to restaurants—customers and their orders. *See Nat'l Elec. Mfrs.*, 272 F.3d at 115 (*Zauderer* applied to law requiring manufacturers to "better inform consumers about the products they purchase"); *Safelite Grp. v. Jensen*, 764 F.3d 258, 263–64 (2d Cir. 2014) (*Zauderer* applies to disclosures concerning "a company's own products or services"). Requiring more information

40

to be disclosed about that transaction falls squarely within *Zauderer*'s scope.

Nor does the fact that some restaurants may choose to leave plaintiffs' platforms transform them into competitors. A restaurant that may decide that plaintiffs' services are no longer worth the fees is simply optimizing its business as it sees fit, not competing in the third-party delivery space that plaintiffs occupy. Indeed, even plaintiffs consistently describe their relationship with restaurants as a partnership, not a competition, and plaintiffs are dependent on restaurants' success for their delivery platforms to succeed (*see, e.g.*, SDNY 21-cv-07695 ECF No. 152 at 6, 49 (describing restaurants as "partners" and distinguishing them from "competitors"); A603, 606, 4432, 4747, 4749, 4672)).

Second, even if there are competitive aspects to the relationship between platforms and restaurants, that does not require heightened scrutiny, as the district court mistakenly held. After all, the First Amendment is not about policing economic competition. And it does not matter under *Zauderer* that the speaker and the recipient have potentially adverse or different interests regarding the information required to be disclosed—that feature was present in *CompassCare*, where the law required employers to tell their employees about the existence of an antidiscrimination protection that was a source of potential legal liability to

41

the employer, and in *New York State Restaurant Ass'n*, 556 F.3d at 131–34, where the law in question required restaurants to disclose calorie information that they may have preferred their customers not know.

Simply put, the rational basis test applies to commercial disclosure requirements under *Zauderer* and its progeny because such laws promote First Amendment truth-seeking principles, while the "constitutionally protected interest in *not* providing any particular factual information" is minimal. *Zauderer*, 471 U.S. at 651; *see Nat'l Elec. Mfrs.* 272 F.3d at 114 ("individual liberty interests … are not ordinarily implicated by compelled commercial disclosure"). While those principles apply no matter how restaurants might use this data, the fact that many will also use it to make more information available to their customers advances the First Amendment's interests too. *See, e.g.*, *IMS Health*, 630 F.3d at 275 (indicating that information "intended to influence marketing efforts" requires lesser scrutiny); *Safelite*, 764 F.3d at 264 (deterring "helpful disclosure to consumers" through advertising inhibits the First Amendment).

By contrast, limiting the amount of commercial information available to consumers—here, restaurants as the purchasers of plaintiffs' services—does not promote First Amendment values. Indeed, this Court and others have not hesitated to apply rational basis scrutiny even

where a required disclosure might lead customers to take their business elsewhere or the speaker has other business reasons for wanting to keep silent. *See Nat'l Elec. Mfrs.*, 272 F.3d at 114 (First Amendment is of limited relevance to the desire of "commercial speakers" to withhold "accurate, factual information"); *RJ Reynolds*, 96 F.4th at 881 (potential that disclosure would "drive away potential clients" did not require heightened scrutiny); Robert Post, *Compelled Commercial Speech*, 117 W. Va. L. Rev. 867, 879–80 (2015) (describing commercial actors' limited "First Amendment autonomy rights" and observing that the First Amendment was not meant to "limit government regulations of the market").

The district court's misplaced concern that customer data is provided only to restaurants and not to "the general public" also does not warrant heightened scrutiny. Requiring the government to compel a speaker to provide *more* speech to satisfy the First Amendment finds no place in this Court's or any other jurisprudence. Instead, the City Council reasonably concluded that the Customer Data Law should require plaintiffs to disclose to individual restaurants only that data related to orders placed with those restaurants, rather than make a broad public disclosure. *See, e.g.*, *Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011) (that disclosure was not to "the public" supported

43

constitutionality); *cf. Riley*, 487 U.S. at 800 (requiring disclosure to the government that is later publicly disseminated is not compelled speech). And that tailored approach also fully aligns with the First Amendment principles underlying *Zauderer* supporting the "free flow of accurate information" to consumers—including restaurants, as consumers of plaintiffs' services—thus warranting less stringent scrutiny. *Rest. Ass'n*, 556 F.3d at 132; *see CompassCare*, 125 F.4th at 63–65 (applying *Zauderer* disclosure mandate for nonpublic employee handbook).

The district court also erroneously refused to apply a rational basis standard because the law purportedly did not concern "the terms under which Plaintiffs' services will be available" (SPA32 (cleaned up)). *Zauderer*'s application is not limited to clarifying a proposed transaction's terms. *See, e.g.*, *CompassCare*, 125 F.4th at 63–65 (applying *Zauderer* to disclosures in employee handbook); *Chamber of Com. v. SEC*, 85 F.4th 760, 770 (5th Cir. 2023) (applying *Zauderer* to requirement that publicly traded companies disclose reasons for stock buyback); *Md. Shall Issue*, 91 F.4th at 246, 249–50 (applying *Zauderer* to requirement that gun sellers distribute information about suicide and how to store firearms safely).

The court's statement also misunderstands the relationship between plaintiffs and restaurants. As explained above, restaurants

44

essentially purchase plaintiffs' services to access more customers and the orders that come with it. Accordingly, the Customer Data Law requires plaintiffs to disclose more information about the very thing that plaintiffs are offering restaurants in exchange for their agreement to pay commission fees, placing the law squarely within the scope of *Zauderer*. *See Rest. Ass'n*, 556 F.3d at 131 (reviewing disclosure "in connection with" commercial transaction for rational basis); *Nat'l Elec. Mfrs.*, 272 F.3d at 115 (rational basis applied to disclosure intended "to better inform consumers about the products they purchase").

Contrary to plaintiffs' assertions below (*see, e.g.*, SDNY 21-cv-07695 ECF No. 152, at 31–32), this Court's decision in *Safelite Group v. Jensen*, 764 F.3d 258 (2d Cir. 2014), also does not lead to a different result. There, this Court declined to apply *Zauderer*'s rational basis test because the law at issue—which prohibited the plaintiff from promoting its affiliate's auto-glass repair company unless it also promoted a competitor—was not a purely informational disclosure law at all. Instead, the law functioned as a *restriction* on speech by requiring the plaintiff to "choose between silence about the products and services of their affiliates or give a (random) free advertisement for a competitor." *Id.* at 264. That type of regulation did "more to inhibit First Amendment values than to advance them." *Id.*

45

Here, the Customer Data Law cannot be construed in any way as a speech restriction. Plaintiffs may still stake out any position that they like regarding customer data, and the law does not change, silence, or encumber any message that plaintiffs otherwise desire to transmit. Indeed, it operates completely independently of any other speech plaintiffs may choose to engage in. What's more, customer data itself—and even its disclosure—is not controversial in any relevant sense. Indeed, restaurant customers disclose this data voluntarily to plaintiffs, and plaintiffs similarly disclose this data when it suits their economic interests. And while plaintiffs no doubt disagree with "the policy judgment" motivating the law, that does not raise a controversy over the content of the customer data itself that implicates any First Amendment concerns. *See CompassCare*, 125 F.4th at 65 (distinguishing between disagreements over the purpose of the law and the information subject to disclosure in assessing whether information is "controversial").

## C. The Customer Data Law is reasonably related to the City's legitimate interests and satisfies *Zauderer* rational basis scrutiny.

Applying *Zauderer*, the Customer Data Law satisfies First Amendment scrutiny. Under the applicable test, which this Court has described as a form of "rational basis review," a regulation compelling commercial

46

speech does not violate the First Amendment if it is "reasonably related to the State's interest" and is neither "unjustified or unduly burdensome." *CompassCare*, 125 F.4th at 64, 67. This Court has approved a wide variety of disclosure requirements under this standard, including laws seeking to reduce obesity or the amount of mercury in the environment. *See Rest. Ass'n*, 556 F.3d at 120 (calorie information); *Nat'l Elec. Mfrs.*, 272 F.3d at 115 (mercury labeling). And as this Court has repeatedly made clear, it is unnecessary to target "consumer confusion or deception" for a disclosure law to satisfy rational basis scrutiny. *See Rest. Ass'n*, 556 F.3d at 133 & n.21 ("laws mandating factual disclosures are subject to the rational basis test even if they address non-deceptive speech"); *Nat'l Elec. Mfrs.*, 272 F.3d at 115 (*Zauderer* review applied to statute "increasing consumer awareness" notwithstanding lack of "confusion or deception"); *see also RJ Reynolds*, 96 F.4th at 883 ("*any* legitimate state interest suffices" under *Zauderer*).

Demonstrating that the law is not unjustified or unduly burdensome also is not onerous. While the asserted interest must be "potentially real" and not "purely hypothetical," *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 776 (2018), the government "has no obligation to produce evidence[] or empirical data to sustain rationality," *Rest. Ass'n*, 556 F.3d at 134 n.23 (quoting *Lewis v. Thompson*, 22

47

F.3d 567, 582 (2d Cir. 2001)) (cleaned up); *see also Lewis*, 252 F.3d at 582 (law satisfies rational basis scrutiny if there is a "conceivable basis which might support it" (quoting *Madden v. Kentucky*, 309 U.S. 83, 88 (1940)). That the government may have "alternative means of achieving its goals" is also insufficient to demonstrate that a regulation is unreasonable, nor does a regulation fail this test if it compels "under-inclusive" factual disclosures. *Rest. Ass'n*, 556 F.3d at 133–34 & n.22. As the Supreme Court has explained, "governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied." *Zauderer*, 471 U.S. at 651 n.14.

And here, the legislative record amply demonstrates that the Customer Data Law does not violate the First Amendment. The restaurant industry supports hundreds of thousands of jobs, billions of dollars in revenue, and tens of thousands of small businesses in New York City. This critical industry thus powers large segments of the City's economic and cultural life, and supporting it easily qualifies as a "legitimate public purpose." *Melendez v. City of N.Y.*, 16 F.4th 992, 1037–38 (2d Cir. 2021); *see Cmty. Hous. Improvement Program v. City of N.Y.*, 59 F.4th 540, 557 (2d Cir. 2023) ("beyond dispute that neighborhood continuity and stability are valid bases for enacting a law"); *Edwards v. District of Columbia*, 755 F.3d 996, 1002 (D.C. Cir. 2014) ("promoting a major

48

industry that contributes to the economic vitality of the [locality] is a substantial government interest").

And as third-party delivery companies impose costs on more and more restaurant transactions, the City has an even more substantial interest in alleviating harms from this disruption. Indeed, as these companies have become more prevalent and embed themselves in more and more of a restaurant's orders, the costs of being unable to forge a direct relationship with customers while being forced to pay high commissions to plaintiffs results in an economic drag that many restaurants may not be able to overcome. Regulations like the Customer Data Law "inhibit[ing] ... displacement" of restaurants as a result of plaintiffs' business practices thus serves a legitimate governmental purpose too. *Nordlinger v. Hahn*, 505 U.S. 1, 12 (1992).

Plaintiffs criticize this as economic protectionism, but even if it were, "[t]he simple truth is that the Supreme Court has long permitted state economic favoritism of all sorts, so long as that favoritism does not violate specific constitutional provisions or federal statutes." *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 286 (2d Cir. 2015); *see also, e.g.*, *Fitzgerald v. Racing Ass'n*, 539 U.S. 103, 109 (2003) (rational to enact law favoring riverboats over racetracks, especially where the former was "facing financial peril"). Thus, even if the law were directed only

at improving restaurants' economic standing at plaintiffs' expense, that would not demonstrate that the Customer Data Law lacked a rational basis.

What's more, the Customer Data Law serves objectives far beyond economic protectionism. As the Supreme Court has made clear, the governmental interest "in eliminating restraints on fair competition is always substantial." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994). And here, the promise of third-party delivery companies is that they will provide additional business that restaurants would be unable to generate on their own. But as this handful of multibillion-dollar companies has concentrated tremendous market power, usurped traditional business models, and displaced restaurants' ability to form direct relationships with their customers, policymakers may reasonably determine that network effects and oligopolistic power are hampering the free operation of the market. The COVID-19 pandemic arguably worsened the imbalances by forcing restaurants to pivot even more to delivery, a change that continues to redound to plaintiffs' benefit as more and more restaurants found themselves joining plaintiffs' platforms.

By restoring restaurants' ability to have relationships and communicate with their delivery customers, the Customer Data Law thus serves a legitimate, even substantial, governmental interest far beyond

50

protectionism. Plaintiffs' stranglehold on customer data presented restaurants with a stark choice: remain on plaintiffs' platforms while continuing to pay high commission fees, or leave those platforms, lose access to their customer base, and see plaintiffs use the customer data generated from these restaurants to promote their competitors. For some restaurants, neither is a viable option. Giving restaurants some ability to interrupt this distorted dynamic, as more and more restaurant business is funneled through these platforms, thus allows restaurants, not plaintiffs, to choose how to structure their own businesses. The Customer Data Law does so by facilitating restaurants' ability to develop closer relationships with customers directly and potentially to counteract plaintiffs' promotion of competitors, and by making it more feasible for restaurants to leave plaintiffs' platforms if they choose.

And the economic benefits of allowing restaurants to request data on their customers are significant. By continuing to stand between restaurants and their customers, plaintiffs inhibit restaurants from speaking to the 20 percent of their customers that studies showed are responsible for 80 percent of many restaurants' business (A530, 794). Without the Customer Data Law, restaurants seeking to maintain their relationships with these loyal customers or to convert more of their patrons into repeat customers are forced to continue paying plaintiffs' commissions

51

to use their marketing and communications channels. Reducing the extent to which plaintiffs may exploit this power dynamic promotes economic freedom, not simple protectionism.

The Customer Data Law is also narrow in scope, further demonstrating that its requirements are not unduly burdensome. For one thing, the law does not prevent plaintiffs from using any of the data themselves, even if they must share some of it with others. Knowing a customer's preferences can be valuable in marketing even if someone else knows that information too. What's more, plaintiffs collect this data and far more regarding restaurant patrons, including by amassing a record of their orders at multiple restaurants and accessing personal data completely unrelated to their orders (A576–78, 4546–48, 4683–84, 4858–59, 4887–88, 4964–65, 4929, 4993–94). And that data is global in scope, encompassing every restaurant and customer that interacts with their platforms and every order that each customer places (*id.*). That plaintiffs may be required to disclose a narrow slice of restaurant-specific information to individual business—much of which plaintiffs already disclose for order fulfillment—is a drop in the bucket compared with the vast ocean of aggregate data that plaintiffs use for profit and to shape their businesses.

52

Further, the law requires disclosures to restaurants only when they request it, thus limiting the law's requirements to only those restaurants with an expressed need for the data and the desire to use it. At plaintiffs' urging (A4792–99), the Customer Data Law also gives customers the ability to opt out of data sharing, thus permitting disclosure of customer data for only those individuals that are most receptive to communications from restaurants. And if a customer "withdraw[s] their consent," restaurants may no longer use that data and must also delete it "upon request." Admin. Code § 20-563.7. Many of these tailored steps were adopted in response to plaintiffs' concerns as the law was drafted (A4792–99), and they narrow the law's impact to only data pertaining to a restaurant's own customers who choose not to reject further outreach—*i.e.*, the only group with which a restaurant can reasonably claim to have a relationship. This too demonstrates the law's rationality.

### D. Even if intermediate scrutiny applied, the Customer Data Law would satisfy that standard.

Finally, even if the district court were correct that intermediate scrutiny applied to the Customer Data Law, notwithstanding that it does not restrict the dissemination of any commercial information, the law would still satisfy the First Amendment. To apply intermediate scrutiny, this Court must determine whether "(1) the speech restriction concerns

53

unlawful activity; (2) the City's asserted interest is substantial; (3) the prohibition directly advances that interest; and (4) the prohibition is no more extensive than necessary to serve that interest." *Vugo, Inc. v. City of N.Y.*, 931 F.3d 42, 51 (2d Cir. 2019) (cleaned up). There is no dispute that the Customer Data Law does not regulate unlawful activity, and so whether it satisfies intermediate scrutiny turns on the remaining three criteria.

And here, for the same reasons described above, the Customer Data Law directly advances a substantial government interest. As explained, there is a substantial interest not only in preserving the viability of the restaurant industry, but also in ensuring that restaurants are not subject to unfair competitive restraints. *See Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 160 (2d Cir. 2013) (sustaining regulation under intermediate scrutiny because it promoted "fair competition"); *Edwards*, 755 F.3d at 1002 (supporting "major industry" in a municipality is a substantial interest). The Customer Data Law advances both aims by allowing restaurants to form closer ties with their community, promoting their ability to develop loyal customer followings, while also enabling restaurants to leave plaintiffs' platforms without losing access to their customer base. Customer data in the hands of restaurants also allows those restaurants to take direct marketing steps to counteract

54

plaintiffs' unfair promotion of a restaurant's competitors using data developed in connection with that restaurant.

Contrary to the district court's reasoning, the City also sufficiently demonstrated that the harms that the Customer Data Law sought to address were "real." *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). To satisfy this burden, the City did not need to produce "empirical data … accompanied by a surfeit of background information." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). Instead, speech regulations may be justified "by reference to studies and anecdotes pertaining to different locales altogether," and even "history, consensus, and 'simple common sense.'" *Id.* (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995)).

The City Council passed the Customer Data Law after holding three hearings that addressed concerns about this data, receiving testimony from stakeholders from all sectors, and issuing three reports concerning the need for legislative action in light of the rise of third-party delivery and the rising potential for exploitation. From that extensive factfinding, the Council was well aware of the ever-larger impact of third-party delivery in the restaurant business, the high fees that plaintiffs were charging, and the need for restaurants to have the option to leave third-party platforms should business needs demand it (A529–31,

573–81, 1385–98). The specific importance of customer data to restaurants was also demonstrated through studies showing that 80 percent of restaurants' business came from just 20 percent of their customers, and so being unable to market directly and develop those lasting relationships unfairly impaired restaurants' ability to compete with other restaurants (A530, 580). And, the City Council also received testimony describing how the lack of access to customer data forced restaurants to stay on plaintiffs' platforms, even if that was a losing economic proposition, or else lose contact with those customers as plaintiffs used the restaurants' data to promote their competitors (A573–81, 595–96, 99). This evidence, buttressed by common sense, amply demonstrated the harms that the Customer Data Law sought to address.

The Customer Data Law is also sufficiently tailored to address these interests. Under intermediate scrutiny, sufficient tailoring does not require demonstrating "that the regulation is the least speech-restrictive means of advancing the Government's interests." *Time Warner Cable*, 729 F.3d at 164 (cleaned up) (quoting *Turner*, 512 U.S. at 662). Instead, the City need only show "a reasonable fit" between the regulation and its goal, given that the City is afforded "considerable leeway in determining the appropriate means to further a legitimate government interest." *Vugo*, 931 F.3d at 58. What's more, this Court has emphasized

56

that it is "loath to second-guess the government's judgment" as to whether the means chosen are appropriate. *Id.* (cleaned up) (quoting *Fox*, 492 U.S. at 478).

Requiring the disclosure of customer data would also directly advance the City's substantial interest in supporting the restaurant industry and ensuring that plaintiffs' hoarding of that information does not harm restaurants. Mandating this disclosure upon restaurants' request directly provides restaurants a valuable tool to preserve their relationships with their best customers. And, the disclosure also gives restaurants the necessary flexibility to respond to plaintiffs' promotion of competitors, including by promoting themselves through direct customer outreach. Once restaurants receive this data, they would also no longer be forced to remain on plaintiffs' platforms to maintain this access to their customers, thus allowing restaurants to determine how best to allocate their resources in an industry where third-party delivery platforms have grown more and more powerful.

In erroneously concluding otherwise, the district court expressed the view that the Customer Data Law had no impact because plaintiffs could still use customer data to promote restaurants' competitors, and because restaurants could leave plaintiffs' platforms even without the Customer Data Law (SPA35). To reach that conclusion, however, the

57

district court had to ignore the common-sense reality that even if plaintiffs would still be able to use this data for advertising, it could nonetheless be a step toward leveling the playing field for restaurants to have access to this data for advertising too. Granting restaurants that ability wholly aligns with the First Amendment's goal of promoting the flow of commercial information so that consumers can make informed decisions. And the district court's speculation that restaurants could still leave plaintiffs' platforms even without customer data in hand (SPA35) also contradicts the testimony before the City Council in enacting the law, which described restaurants' reticence to do so out of concern that they would lose access to existing customers.

Similarly, the district court's view that restaurants should just use plaintiffs' tools to contact their customers ignores the dynamic from third-party delivery that the City Council sought to address. According to the court, plaintiffs "currently provide marketing tools," including "solicited listings, promotions, and other forms of advertising" that restaurants can use to reach their customers (SPA36). But taking full advantage of those offerings costs restaurants even more money, on top of the commissions for baseline services that they must pay to stay on plaintiffs' platforms at all (*e.g.*, A4484–87 (DoorDash fee-based promotions); A4646–52 (describing Uber Eats promotions available at

58

additional cost); A4678 (describing Grubhub's premium charges for running promotions)). The district court's misplaced belief that the informational imbalance does not matter ignores this reality, as well as the City Council's judgment that restaurants should be able to leave plaintiffs' platforms without losing access to their customers.

Finally, plaintiffs and the district court posited alternatives to the Customer Data Law, but none of their proposals would directly address the harms to restaurants from lack of access to customer data. *See Vugo*, 931 F.3d at 58–59 (upholding "most direct" approach to addressing legislative aims, even if there are "conceivable alternative[s]"). For example, while requiring customers to opt-in to sharing data (instead of the law's existing opt-out) or incentivizing third-party delivery companies to disclose this data voluntarily may result in less data being shared (SPA37), that result runs directly contrary to the Customer Data Law's legitimate goals of improving restaurants' ability to market to their customers and to enable them to maintain these relationships even if restaurants leave plaintiffs' platforms. So too as to the other potential mechanisms that plaintiffs and the district court cited for encouraging future orders to be submitted directly to restaurants, such as allowing restaurants to include marketing materials in delivery bags promoting direct orders or to subsidize restaurants' creation of their own ordering

59

platforms (SPA37; SDNY 21-cv-07695 ECF No. 152, at 32–33). These measures would do nothing to preserve the relationship with existing customers who have not placed direct orders.

Accordingly, the City's interests in promoting restaurant access to these customers "would be achieved less effectively" absent the Customer Data Law, and so the law satisfies intermediate scrutiny. *Time Warner Cable Inc.*, 729 F.3d at 164. The Customer Data Law was thus sufficiently tailored to address the harms from third-party delivery companies' business practices, and by placing more information in the hands of restaurants, the law satisfied the First Amendment.

## CONCLUSION

The Court should reverse the district court's judgment.

Dated:  New York, New York
        May 23, 2025

                                    Respectfully submitted,

                                    MURIEL GOODE-TRUFANT
                                    *Corporation Counsel*
                                    *of the City of New York*
                                    Attorney for Appellant

                            By:  _____

                                    JONATHAN SCHOEPP-WONG
                                    Assistant Corporation Counsel

                                    100 Church Street
                                    New York, New York 10007
                                    212-356-2275
                                    jschoepp@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
JONATHAN SCHOEPP-WONG
    *of Counsel*

61

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 12,318 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____
JONATHAN SCHOEPP-WONG